# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **ADELE M. SHELTON** | **CIVIL ACTION** |
| **VERSUS** | **NO:  06-4172-SSV-SS** |
| **JO ANNE BARNHART, COMMISSIONER OF SOCIAL SECURITY ADMINISTRATION** | |

## REPORT AND RECOMMENDATION

The plaintiff, Adele M. Shelton ("Shelton"), seeks judicial review, pursuant to Section 405(g) of the Social Security Act (the "Act"), of the final decision of the Commissioner of the Social Security Administration (the "Commissioner") denying her claims for disability insurance benefits under Title II of the Social Security Act ("Act"), 42 U.S.C. § 423, and for supplemental security income ("SSI") under Title XVI of the Act, 42 U.S.C. § 1382(a)(3).  Rec. doc. 1.

## PROCEDURAL HISTORY

On November 6, 2003, Shelton submitted her application for benefits alleging that she became unable to work on November 3, 2003.  R. 46.  Her supplemental interview reported seizures and a broken ankle.  R. 63-66.  In an April, 2004 disability report she indicated that her seizures were worse and she suffered from increased anxiety and memory loss.  R. 67-73.  On March 25, 2004, her application was denied.  R. 26-29.

There was a hearing before an Administrative Law Judge on July 27, 2005.  In addition to Shelton and a vocational expert, there was testimony from Shelton's daughter and her sister-in-law.  R. 12 and 210.  On February 24, 2006, the ALJ issued an unfavorable decision.  R. 9-20.  On July

10, 2006, the Appeals Council denied her request for review.  R. 4-6.  The decision reflects that the Appeals Council considered as additional evidence outpatient medical records from Baton Rouge General Hospital from February 16, 2004.  R. 7.

On August 9, 2006, Shelton filed her complaint.  Rec. doc. 1.  She filed a motion for summary judgment and a motion to submit additional evidence.  Rec. docs. 11-14.  The Commissioner filed a cross-motion for summary judgment and opposed the motion to submit additional evidence.  Rec. doc. 17.

Shelton was represented by counsel throughout these proceedings although counsel in this Court is different from her counsel in the administrative proceeding.

## STATEMENT OF ISSUES ON APPEAL

Shelton's filings raise the following issues:

1. Whether her motion to submit new and material evidence should be granted and the matter be remanded to the ALJ?

2. Whether the ALJ erred in failing to fully and fairly develop the record?

3. Whether the ALJ erred by failing to find that Shelton's condition meets or medically equals Listing 11.02?

## THE ALJ'S FINDINGS RELEVANT TO ISSUES ON APPEAL

The ALJ made the following findings relevant to the issue on appeal:

1. The claimant meets the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act and is insured for benefits through the date of this decision.

2. The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

3. The claimant's seizure disorder is considered "severe" based on the requirements in the Regulations 20 CFR §§ 404.1520(c) and 416.920(c).  Her major depression, mood disorder, and status post ankle and finger fractures are not severe since they do not impose more than

2

minimal limitations on her ability to perform work related duties Social Security Ruling 96-3p.

4.   These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

5.   The undersigned finds that the claimant's allegations regarding her limitations are not totally credible for the reasons set forth in the body of the decision.

6.   The claimant has the residual functional capacity to do heavy work but cannot climb scaffolds ladders or ropes; and must avoid unprotected heights, working near dangerous machinery, and cannot work in extreme cold or heat.

7.   The claimant is able to perform any of her past relevant work as a cashier, stock person (20 CFR §§ 404.1565 and 416.965).

8.   In the alternative, assuming that she cannot do that work, the claimant is a "younger individual between the ages of 18 and 44" (20 CFR §§ 404.1563 and 416.963).

9.   The claimant has a "limited education" (20 CFR §§ 404.1564 and 416.964).

10   The claimant has transferable skills from semi-skilled work previously performed as described in the body of the decision (20 CFR §§ 404.1568 and 416.968).

11.  The claimant has the residual functional capacity to perform a significant range of heavy work (20 CFR §§ 404.1567 and 416.967).

12.  Although the claimant's exertional limitations do not allow her to perform the full range of heavy work, using Medical-Vocational Rule 204.00 as a framework for decision-making, there are a significant number of jobs in the national economy that she could perform.

13.  The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR §§ 404.1520(g) and 416.920(g)).

R. 19-20.

## **ANALYSIS**

a.   **Standard of Review.**

The function of this court on judicial review is limited to determining whether there is

substantial evidence in the record to support the final decision of the Commissioner as trier of fact

and whether the Commissioner applied the appropriate legal standards in evaluating the evidence. Newton v. Apfel, 209 F.3d 448, 452 (5th Cir. 2000); Spellman v. Shalala, 1 F.3d 357, 360 (5th Cir. 1993). Substantial evidence is more than a scintilla but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427 (1971); Newton, 209 F.3d at 452. Alternatively, substantial evidence may be described as that quantum of relevant evidence that a reasonable mind might accept as adequate to support a conclusion. Carey v. Apfel, 230 F.3d 131, 135 (5th Cir. 2000). This court may not re-weigh the evidence, try the issues *de novo* or substitute its judgment for the Commissioner's. Id.; Selders v. Sullivan, 914 F.2d 614, 617 (5th Cir. 1990).

The administrative law judge is entitled to make any finding that is supported by substantial evidence, regardless of whether other conclusions are also permissible. See Arkansas v. Oklahoma, 503 U.S. 91, 113, 112 S.Ct. 1046, 1060 (1992). Despite this court's limited function, it must scrutinize the record in its entirety to determine the reasonableness of the decision reached and whether substantial evidence exists to support it. Villa, 895 F.2d at 1022; Johnson v. Bowen, 864 F.2d 340, 343-44 (5th Cir. 1988). Any findings of fact by the Commissioner that are supported by substantial evidence are conclusive. Ripley v. Chater, 67 F.3d 552, 555 (5th Cir. 1995).

To be considered disabled and eligible for disability insurance benefits, plaintiff must show that he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). The Commissioner has promulgated regulations that provide procedures for evaluating a claim and determining disability. 20 C.F.R. §§ 404.1501 to 404.1599

& appendices, §§ 416.901 to 416.998 (1997).  The regulations include a five-step evaluation process

for determining whether an impairment prevents a person from engaging in any substantial gainful

activity.  Id. §§ 404.1520, 416.920; Newton v. Apfel, 209 F.3d at 453; Greenspan v. Shalala, 38 F.3d

232, 236 (5th Cir. 1994), cert. den. 514 U.S. 1120, 115 S. Ct. 1984 (1995).[1]  The five-step inquiry

terminates if the Commissioner finds at any step that the claimant is or is not disabled.  Leggett v.

Chater, 67 F.3d 558, 564 (5th Cir. 1995).

The claimant has the burden of proof under the first four parts of the inquiry.  Id.  If she

successfully carries this burden, the burden shifts to the Commissioner to show that other substantial

gainful employment is available in the national economy, which the claimant is capable of

performing.  Greenspan, 38 F.3d at 236; Kraemer v. Sullivan, 885 F.2d 206, 208 (5th Cir. 1989).

When the Commissioner shows that the claimant is capable of engaging in alternative employment,

"the ultimate burden of persuasion shifts back to the claimant."  Id.; accord Selders, 914 F.2d at 618.

The Court "weigh[s] four elements of proof when determining whether there is substantial

---

[1]  The five-step analysis requires consideration of the following:

First, if the claimant is currently engaged in substantial gainful employment, he or she is found not disabled. 20 C.F.R. §§ 404.1520(b), 416.920(b).

Second, if it is determined that, although the claimant is not engaged in substantial employment, he or she has no severe mental or physical impairment which would limit the ability to perform basic work-related functions, the claimant is found not disabled.  Id. §§ 404.1520(c), 416.920(c).

Third, if an individual's impairment has lasted or can be expected to last for a continuous period of twelve months and is either included in a list of serious impairments in the regulations or is medically equivalent to a listed impairment, he or she is considered disabled without consideration of vocational evidence.  Id. §§ 404.1520(d), 416.920(d).

Fourth, if a determination of disabled or not disabled cannot be made by these steps and the claimant has a severe impairment, the claimant's residual functional capacity and its effect on the claimant's past relevant work are evaluated.  If the impairment does not prohibit the claimant from returning to his or her former employment, the claimant is not disabled.  Id. §§ 404.1520(e), 416.920(e).

Fifth, if it is determined that the claimant cannot return to his or her former employment, then the claimant's age, education and work experience are considered to see whether he or she can meet the physical and mental demands of a significant number of jobs in the national economy.  If the claimant cannot meet the demands, he or she will be found disabled.  Id. §§ 404.1520(f)(1), 416.920(f)(1).  To assist the Commissioner at this stage, the regulations provide certain tables that reflect major functional and vocational patterns.  When the findings made with respect to claimant's vocational factors and residual functional capacity coincide, the rules direct a determination of disabled or not disabled. Id. § 404, Subpt. P, App. 2, §§ 200.00-204.00, 416.969 (1994) ("Medical-Vocational Guidelines").

evidence of disability: (1) objective medical facts; (2) diagnoses and opinions of treating and examining physicians; (3) the claimant's subjective evidence of pain and disability; and (4) [her] age, education, and work history."   Martinez v. Chater, 64 F.3d 172, 174 (5th Cir. 1995).   "The Commissioner, rather than the courts, must resolve conflicts in the evidence."  Id.

b.   **Testimony at Hearing.**

i.      **Adele Shelton.**

Shelton was 42 at the time of the hearing.  R. 217.   She was 5'4" and weighed 97 pounds. R. 234.  She tried to gain weight but could not.  R. 243.  She completed the eighth grade.  R. 217. Because of seizures, she was forced to withdraw from the ninth grade.  R. 217-18.

Shelton worked at Walgreen's for about five years from 1999 through 2003 as a cashier and stock clerk.  R. 219.  As a stock clerk she was required to open boxes and put merchandise on shelves.  R. 220.  This required her to lift about twenty-five to fifty pounds.  R. 220.  As a cashier she would do transactions involving credit cards, checks and cash.  R. 221.  She also cut ads out of the newspaper and posted them in the store.  R 222.  She worked about three or four days a week. R. 222.  The job required that she stand all the time.  R. 222.

Shelton did not like the stock clerk job at Walgreen's because there was too much stress. R. 235.  She was given one thing to do and then she would be pulled off of that task and told to do something else.  R. 235.  She became nervous when her boss told her she was not working fast enough.  R. 242.  There was less stress as a cashier and she liked that job.  R. 235.  She lost her job because she could no longer drive to work.  R. 225.

Shelton broke her left ankle in a fall in November 2003.  R. 223 and 227-29.  It required about ten screws to fix multiple breaks.  R. 223.  The screws were not removed.  R. 232.  After the

6

surgery at Ochsner she used a walker.  R. 224.  The doctor put her in a padded boot and she stopped using the walker after about a month.  R. 231.

Shelton had seizures three or four times a month.  R. 239.  The last seizure before the hearing occurred while she washing clothes.  R. 236.  She fell down a lot with her seizures.  R. 236.  One time she injured her wrist in a fall.  R. 236.  The medication for her seizures caused her to act like a drunk if she woke up during the night.  R. 237.  She was unable walk in a straight line.  She could not talk.  She was delirious.  R. 237.  She was only able to sleep about three hours at night.  She woke up groggy and tired in the morning.  R. 237-38.  After one of her seizures, she was given a psychological evaluation at East Jefferson Hospital.  R. 240 and 249.  She was put in lock down at the hospital and confined for about two weeks.  R. 249-50.  This occurred about two years before the hearing.  R. 250.  At the time of the hearing there were no records of this hospitalization or confinement.  R. 253.

Shelton had a lot of severe headaches.  R. 241.  They were caused by exposure to sunlight and heat. R. 241.  She suffered from anxiety.  R. 241.  She was not comfortable around people in a grocery store.  R. 243.  She cried a lot.  She sat all day.  She had no appetite.  R. 243.  At the time of the hearing she was not obtaining any mental health treatment.  R. 255-56.  She stopped going to the Rosenblum Mental Health Center about four years before the hearing.  R. 256.  She tried to go back, but it would not accept her.  R. 256.  She was taken off of Neurontin because she suffered from side effects.  R. 257.  She did take Zonegram.  R. 258.

At the time of the hearing the only doctor she went to was Dr. Olson, a neurologist.  R. 234.  She described Dr. Olson as her family practitioner.  R. 234.  Prior to the hearing she took anti-depressants.  R. 235.  Her doctors told her the medication triggered her seizures.  R. 236.  She took

medication for her seizures but it did not stop them.  R. 243.

At time of the hearing Shelton lived in her mother's one story house with her sixteen year old daughter.  R. 226.  Her mother did not live in the house.  R. 226.  Shelton's sister-in-law or other members of her family did the driving for her.  R. 230.  She did not visit anyone and people did not visit her.  R. 230.  She maintained contact by telephone.  R. 230.  Shelton did some cooking and cleaning.  R. 227.  She tried to stay away from the stove because of the heat.  R. 242.  She did the housework.  R. 229.  During the day she watched television.  She had difficulty following the story line in a movie.  R. 238.  She could not remember what happened in a soap opera from one day to the next.  R. 238.  She did not read books because she could not comprehend them.  R. 238-39.

  ii. **Marilyn Miller.**

Marilyn Miller is Shelton's daughter.  R. 244-45.  She witnessed her mother have seizures. When they occurred Shelton fell down and shook violently.  Other times she stood and just turned her head very far.  R. 245.  The last seizure she saw was about a month before the hearing.  R. 245. Miller did not help her mother much around the house.  R. 245.

  iii. **Nancy Wilkenson.**

At the time of the hearing Wilkenson had known Shelton for five years.  R. 246.  She witnessed Shelton have three seizures.  R. 246 and 248.  The first time was at a doctor's office about a year before the hearing.  R. 246.  Shelton got up to use the bathroom, when she began staring. Wilkenson tried to talk to her but she did not know she was there.  R. 248.  The last seizure Wilkenson saw occurred when Shelton was in her car.  R. 248.  Shelton blacked out and did not know she was in the car.  R. 248.

  iv. **Vocational Expert.**

With the limitations described by the ALJ, the vocational expert testified that Shelton could continue to work as a cashier but could not work as a stock clerk.  R. 260.  She could also work in a unskilled positions that only required light duty.  R. 261.  She could not work in a hotel if she had a seizure on the job.  R. 262.  If Shelton's medication made her groggy and unable to concentrate on a consistent basis she could not work as a cashier.  R. 263.

The ALJ reported that the record would be held open until August 25, 2005 for additional medical records.  R. 255

c.    **Medical Records.**

On August 19, 1998, Shelton was seen at the Rosenblum Mental Health Center ("Rosenblum").  The notes indicate this was not her first visit.  She dropped out of a secretarial training course after she felt overwhelmed.  She reported decreased energy and felt despondent.  R. 142.[2]  On October 26, 1998, she returned to Rosenblum.  She reported that her husband left again.  She worked at Elmer's Candy on the night shift.  She took Trazadone at night.  It made her drowsy during the day.  R. 143.  On December 18, 1998, she was seen at Rosenblum.  She was working and did not need Trazadone to help her sleep.  She denied depression.  R. 143.

On February 11, 1999, Shelton returned to Rosenblum.  She reported that she felt overwhelmed because of financial problems.  R. 143.  On April 8, 1999, she was seen at Rosenblum and reported difficulty sleeping.  R. 140.  On June 8, 1999, she returned to Rosenblum and reported she was working but found it stressful.  R. 140.  On August 16, 1999, she was seen at Rosenblum and reported that she had fallen and broken her arm or wrist.  Surgery was required to repair the

---

[2]  In this section the medical records includes the medical records that are part of the administrative record as well as the medical records that Shelton seeks to add to the record.  The medical records from the administrative record are referenced with the letter "R" followed by the page number.  Shelton's motion to submit additional evidence seeks to add 42 pages of medical records.  Rec. doc. 11.  These are referenced with the letter "A" followed by the page number.

break.  R. 140.  On October 8, 1999 she returned to Rosenblum and reported she was working but still had financial problems.  R. 141.  On December 2, 1999, she returned to Rosenblum with complaints of anxiety, crying spells, and suicidal thoughts.  R. 138 and 141.  She reported that Prozac was not alleviating her symptoms.  R. 138.  There were significant family problems.  She was employed and enjoyed work.  R. 138.  She complained of irritability, sleeping difficulties, and tiredness.  R. 141.

On February 9, 2000, Shelton returned to Rosenblum and reported she was doing well on her medications.  She was working and enjoyed it.  R. 138.  On April 5, 2000, she returned to Rosenblum and reported she was stable on her current medication.  R. 139.  On June 21, 2000, she was seen at Rosenblum and reported she was doing well on her medication.  R. 139.  Trazadone and Paraxetine were prescribed.  R. 137.

On October 20, 2000, Rosenblum completed a discharge summary with a diagnosis of major recurrent depression.  R. 136.  It reported that Shelton was admitted for symptoms of depression after a divorce and separation from her husband.  Initially there was a good response to medication.  Over the preceding two years she frequently missed appointments and went without medication.  The last contact was June 21, 2000.  R. 136.

There are no medical records for the three years between her last visit to Rosenblum and a June 13, 2003 report of an upper respiratory infection at Ochsner Clinic in Tangipahoa ("Ochsner/Tangipahoa").  R. 126.  On July 14, 2003, Ochsner/Tangipahoa diagnosed her with an upper respiratory infection.  R. 124.  On September 9, 2003, Ochsner/Tangipahoa diagnosed her with depression, fatigue, seizure disorder, and sleep deficiency.  Her Prozac dosage was increased. She was to return in two weeks.  R. 123.  On October 17, 2003, she was seen at Ochsner/Tangipahoa

with reports of lower back pain that was exacerbated by certain movements.  R. 122.

On October 28, 2003, Shelton was seen by Dr. Pervez Mussarat on a consult from Dr. Chad Braden.[3]  The history indicated that Shelton began having seizures when she was nine years old. For the last five years she had been free of seizures.  Dr. Mussarat performed a neurological examination.  The doctor reported that the seizures were fairly well controlled with Tegretol.  R. 116-17.  On November 4, 2003, she returned to Dr. Mussarat who performed an EEG in the office. Within twenty minutes, she had six electrical seizures with spike and wave discharges and paroxysmal activity lasting for as long as thirty to forty-five seconds.  R. 112-13.  The results were consistent with epileptiform activity and ictal and interictal activity originating diffusely.  R. 113. Dr. Mussarat instructed her to refrain from driving.  She was required to call her mother to take her home.  Shelton replied that she could not stop driving because of her job.  R. 112.

On November 18, 2003, she was seen at Ochsner/Tangipahoa for an upper respiratory infection and complaints of ankle pain.  R. 121.  On November 28, 2003, Ochsner did x-rays of the left ankle and found that the fracture was healing.  R. 120.  On December 12, 2003, Ochsner did x-rays of her ankle taken as a result of complaints of pain in the joint.  R. 119.

On November 19, 2003, there was an EEG was performed with results that were consistent with paroxysmal features.  R. 108.  Dr. Mussarat reported that this could reflect interictal epileptiform activity.  The EEG was markedly improved from the November 4, 2003 EEG.  R. 108. On December 10, 2003, an MRI was performed at the request of Dr. Mussarat and it was normal. R. 107.  On February 13, 2004, Shelton returned to Dr. Mussarat.  She did not report any seizures

---

[3] Dr. Braden's office was in Hammond, Louisiana.  R. 165.  The medical records do not reveal his speciality. They also do not specify Dr. Mussarat's speciality.  Based upon the treatment provided, it is presumed that Dr. Mussarat was a neurologist.

but reported constant fatigue. The results of an EEG revealed frequent spike and wave discharges. The results for the February 13, 2004 EEG were worse than the results for the one on November 19, 2003. Dr. Mussarat found that she was at risk of a grand mal seizure and instructed Shelton to refrain from driving. He prescribed Lamictal, Topamax, and Carbamazepine. She was to return in three months. R. 113. Three days later she went to Ochsner/Tangipahoa and reported that she had three seizures that morning. She was sent to Baton Rouge General Hospital for evaluation and possible admission to regulate her seizures. R. 118. On that same date Baton Rouge General performed a CT brain scan and no abnormality was detected. R. 207.

On February 20, 2004, at the request of Dr. Braden, Shelton was seen by Dr. Jon Olson, a specialist in adult neurology of the NeuroMedical Center in Baton Rouge for a neurologic evaluation. She reported that she had been seizure free for about five years until November 2003 when she had a Grand-Mal seizure after falling from a ladder at work. She had frequent small seizures but only occasionally did she have a Grand-Mal seizure. She was diagnosed with seizure disorder. R. 165-68.

On March 1, 2004, an EEG was abnormal due to moderate 3 hertz spike and wave bursts. The results seemed consistent with primary generalized epilepsy. Dr. Olson recommended medication adjustment and a follow-up EEG. R. 162. On March 23, 2004, she was seen by Dr. Olson. Her medication was changed. The diagnosis was primary generalized epilepsy and migraine headaches. R. 159. An April 8, 2004 EEG was normal due to multiple brief bursts of epileptiform discharges, which were most notable during hyperventilation. A primary generalization onset versus rapid secondary generalization from a left frontal temporal region was seen. R. 155. In a May 3, 2004 letter, Dr. Olsen reported that Shelton had a history of migraines and epilepsy which were

12

aggravated with hyperventilation, anxiety, or stress.  Her medications were being adjusted.  The restrictions on her driving would not be lifted until she was seizure free for six months.  Optimal seizure control could take as long as four to six months.  R. 154.

On May 11, 2004, Shelton returned to Dr. Olson with complaints of headaches, epilepsy, and depression.  R. 153.  She reported a seizure the prior week.  She complained of anxiety, depression and memory problems.  She had a flat affect.  She was diagnosed with suboptimally controlled epilepsy and depression.  R. 153.  A May 24, 2004 EEG revealed high voltage theta slowing that occurred with hyperventilation and drowsiness.  The study was otherwise normal without epileptiform changes.  R. 150-51.  In a July 6, 2004 letter, Dr. Olsen reported that Shelton's symptoms were severe and disabling and had proven somewhat refractory to treatment.  In order to regain control of her condition, she required ongoing mediation, follow-up visits and EEG testing.  The purpose of the letter was to assist Shelton in maintaining Medicaid benefits.  R. 149.

On July 12, 2004, Shelton sought medical treatment for a "breakdown."  R. 134.  On July 13, 2004, Dr. Olson changed her medication and scheduled her for a follow-up appointment in three months.  R. 148.  A July 22, 2004 EEG revealed generalized spike wave discharges, most notably during hyperventilation.  R. 145-46.

On October 4, 2004, Shelton was seen by Dr. Clifford Williams.[4]  She had fractured the little finger of her hand.  On October 11, 2004, she returned to Dr. Williams and she was instructed to exercise her hand.  R. 182, 183 and 185.

On October 21, 2004, Shelton returned to Dr. Olsen for a follow-up visit.  He diagnosed her with epilepsy and depression.  He noted that many of her antidepressants were associated with

---

[4]  Dr. Williams' speciality is not identified.

seizure exacerbations.  A. 32.  An October 28, 2004 EEG was abnormal due to diffuse slowing, slightly greater on the right side, and generalized spike wave discharge during hyperventilation and shortly thereafter.  A. 29-30.

Dr. Olson referred Shelton to Dr. Carolyn Baker, a specialist in adult neurology, for a second opinion.  On November 18, 2004, Dr. Baker described Shelton's epilepsy as intractable.  Shelton reported that the most recent seizure occurred on the Saturday before the appointment when she experienced two of them.  She reported that stress increased the frequency of her seizures.  She reported headaches, dizziness, decreased ability to hear, decreased vision, memory loss, speech difficulties, confusion, behavioral problems, focal weakness, focal numbness/tremor, gait difficulties, bowel problems, loss of consciousness, chills, arthritis pain and sinus problems.  Dr. Baker diagnosed her with intractable epilepsy.  An EEG revealed partial seizures with a tendency to generalize.   Dr. Baker reported that there was a high probability that Shelton also suffered from psychogenic seizures that would be triggered by stress.  Her Zonegram dosage was increased.  A. 24-28.  Dr. Baker found that the psychogenic or stress induced aspect of her seizures were uncontrolled.  A. 27.

On December 10, 2004, Shelton was seen by Dr. Williams for a several day history of head congestion, sore throat, sinus pressure and cough.  R. 181.

On January 3, 2005, Shelton returned to Dr. Olson for a follow-up visit.  He reported that she looked depressed.  He recommended that she see a neuropsychologist closer to her home in Hammond.  He reported that her seizure control had improved with only two seizures having occurred since her previous visit on October 21, 2004.  A. 22.

On May 3, 2005, Shelton was seen by Dr. Olson.  She reported two seizures in February,

three in March and three in April.  She reported decreased appetite and ongoing depressive symptoms.  A. 17.  A May 3, 2005 EEG revealed right temporal spike activity and three seconds of generalized spike wave occurring during hyperventilation.  A. 19.  Her medications included Zonegram, Gabitril and Chlorozapate.  Dr. Olson diagnosed her with epilepsy and mental health problems that aggravated her epilepsy.  A. 17.

On July 8, 2005, Shelton was seen by Dr. Williams.  She reported pain from an injury to her left chest that she sustained during a seizure which occurred three or four days before the visit.  It was noted that her medication was changed with better control of seizures and she was encouraged to see a neurologist to adjust her medication.  R. 180.

On October 18, 2005, Shelton returned to Dr. Olson for a follow-up visit.  She reported that she was averaging two or three seizures per month.  The diagnosis was refractory epilepsy with probable side effects from her medication.  Dr. Olson decreased the dosage of her medication and asked her to return in four months.  A. 10.

On February 9, 2006, Shelton returned to Dr. Olson reporting that she experienced five or six seizures per month over the two previous months.  It was noted that she wore a left hand brace which was due to an injury sustained in a fall during a seizure.  She appeared fatigued and depressed.  She was diagnosed with right temporal lobe epilepsy which was aggravated by stress.  Her dosage of Gabitril was increased.  A. 7.

In a February 22, 2006 letter, Dr. Olson reported that Shelton suffered from epilepsy and depression.  A. 6.  Her condition was difficult to manage because her symptoms became worse with stress.  Her cognitive abilities were compromised.  A. 6.

A May 22, 2006, EEG revealed generalized spike wave epileptiform discharges, more so

15

from the right hemisphere.  There was also right hemisphere slowing.  A. 5.

On June 9, 2006, Shelton returned to Dr. Olson for a follow-up visit.  She reported seven seizures in the previous month.  Some of the seizures occurred in clusters on the same day.  She tended to look to the left with dystonic posturing for a minute or two.  She continued to be forgetful and moody.  She voiced complaints of back pain after falling in the shower during a seizure.  Her medications included Chlorazepate, Gabitril and Zonegram.  Dr. Olson reported she was depressed and dysphoric.  He diagnosed her with refractory epilepsy.  He recommended that the dosage of Gabitril be increased.  He asked her to return in three months.  A. 1.

On June 26, 2006, Dr. Olson or his office noted a phone call from Shelton.  The words "back to back" and "crying" appear in the note.  The other notes suggest that Shelton's medication was adjusted in response to the call.  A. 1.

d.    **Plaintiff's Appeal.**

Issue.  Whether her motion to submit additional evidence should be granted and the matter remanded to the ALJ?

Shelton argues that her motion to submit additional evidence should be granted and the evidence should be considered on her motion for summary judgment.  The Commissioner correctly responds that if the motion is granted, the additional evidence can only be reviewed to determine if a remand is appropriate.  See Haywood v. Sullivan, 888 F.2d 1463, 1471 (5th Cir. 1989).

Under 42 U.S.C. § 405(g) a claimant's motion to remand is to be granted "upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding. . . ."[5]  In order to justify a remand:

_____

[5] On June 9, 1980, partly in an effort to stem the growing tide of unjustified federal court ordered remands, Congress amended 42 U.S.C § 405(g).  The relaxed "good cause" standard for remand of disability benefit cases was replaced with the current standard.  Dorsey v. Heckler, 702 F.2d 597, 604 (5th Cir. 1983).

16

1.    The evidence must be new and not merely cumulative of what is already in the record;

2.    The evidence must be material; it must be relevant, probative, and likely to have changed the outcome of the Commissioner's determination; and

3.    The plaintiff must demonstrate good cause for not having incorporated the new evidence into the administrative record.

Pierre v. Sullivan, 884 F.2d 799, 803 (5th Cir. 1984);  Dorsey v. Heckler, 702 F.2d 597, 604 (5th Cir. 1983).

In Haywood v. Sullivan, 888 F.2d 1463, 1471 (5th Cir. 1989), the claimant sought a remand on the basis of a psychological evaluation obtained by her subsequent to the ALJ hearing.  The evidence was not in existence at the time of the administrative and district court proceedings, so it met the requirement of "new" evidence.  In Pierre v. Sullivan, 884 F.2d 799, 803 (5th Cir. 1984), there was no difficulty in determining that a recent I.Q. test met the requirement that the evidence be new, because it was not administered until after the claimant filed her complaint in district court. It was not cumulative, because there was no other objective evidence offered of claimant's intellectual ability.

The additional evidence in this case are the reports of Shelton's treatment by Dr. Olson on October 21, 2004; January 3, 2005; May 3, 2005; October 18, 2005; February 9, 2006; and June 9, 2006.  The ALJ's decision is dated February 24, 2006.  The additional evidence which  post-dates the ALJ's decision includes a May 22, 2006 EEG report, a June 9, 2006 report of a visit to Dr. Olson, and a June 26, 2006 office note regarding a call from Shelton.  At least some of the additional evidence is new evidence.

The second prong of the test for remand is materiality.

Reviewing the materiality of new evidence requires us to make two separate

inquiries: (1) whether the evidence relates to the time period for which the disability benefits were denied, and (2) whether there is a reasonable probability that this new evidence would change the outcome of the Secretary's decision.

Ripley, 67 F. 3d at 555.  Implicit in the materiality requirement is that it not concern evidence of a later-acquired disability or of the subsequent deterioration of the previously non-disabling condition. Johnson v. Heckler, 767 F.2d 180, 183 (5th Cir. 1985).

The remand evidence meets the first part of the of the materiality requirement.  Shelton made her application for benefits in November, 2003, alleging that the disability begin at that time.  R. 46. The additional medical evidence relates to the seizure condition, which prompted Shelton's application, and the time period for which the disability benefits were denied.

The second part of the materiality requirement is that there is a reasonable probability that the remand evidence would change the outcome of ALJ's decision.  In finding that Shelton's seizure disorder did not meet the listing requirements, the ALJ, in part, said:

> Dr. Olson's treatment records indicate that he saw her from February 2004 until July 13, 2004, when apparently she was responding to a change in her medication. Though additional medical records were submitted after the hearing held in July 2005, no new evidence has been submitted regarding Dr. Olson's care of the claimant.  The absence of such strongly suggests that she no longer treats with him, since he is her neurologist and his findings would be very important to her in establishing disability.

R. 15.

The first record for treatment of seizures is an October 28, 2003 report by Dr. Pervez Mussarat on a referral from Dr. Chad Braden.  R. 116-17.  The reports suggest that Dr. Mussarat was a neurologist.  Dr. Mussarat attempted to control Shelton's seizures with medication.  There was some progress, but in February 2004 the results of an EEG were worse than the results for the previous EEG on November 19, 2003.  R. 103.  Although Shelton was not to return to Dr. Mussarat

for three months, three days later, on February 16, 2006, she went to Ochsner/Tangipahoa, which referred her to Baton Rouge General for evaluation and possible admission for regulation of her seizures.  R. 118.

On February 20, 2004, Shelton went to Dr. Jon Olson, a Baton Rouge neurologist, on a referral from Dr. Braden.  R. 165-68.  One inference is that, as a result of the events of February 16, 2006, Dr. Braden decided that Shelton should see another specialist for control of her seizures.  Dr. Olson anticipated that, with adjustments to Shelton's medication, it would take until about October 2004 for her to be free from seizures.  R. 154.  Dr. Olson saw Shelton on March 23, 2004, May 11, 2004, July 12, 2004, and October 21, 2004.  R. 159, R. 153, R. 148, and A. 32.  An October 28, 2004 EEG was abnormal.  A. 29-30.

On November 18, 2004, Dr. Olson referred Shelton to another a neurologist for a second opinion.  A. 24-28.  One inference is that when Dr. Olson's adjustments to the medication did not produce a seizure free condition in Shelton, he sought an evaluation by another specialist.  On November 18, 2004, Shelton was seen by Dr. Carolyn Baker.  This was her third neurologist in less than a year.  Dr. Baker indicated that Shelton's psychogenic induced seizures were uncontrolled. A. 27.  Thereafter Shelton returned to Dr. Olson.  She was in contact with Dr. Olson on June 26, 2006.  The notes from that date indicate her medication was undergoing adjustment.  A. 1.  On the June 9, 2006 visit she reported seven seizures in the previous month.  A. 1.

With the additional medical evidence the ALJ would be required to recognize that as of the date of the February 20, 2006 decision:  (1) Shelton was still seeing Dr. Olson for treatment of her seizures; (2) Dr. Olson did not meet his goal of controlling the seizures with medication; (3) he sought the opinion of another neurologist; and (4) Dr. Baker diagnosed uncontrolled psychogenic

induced seizures.  There is a reasonable probability that the remand evidence would change the outcome of ALJ's decision.

The third requirement for a remand is good cause.  Prior to the hearing Shelton's counsel obtained records from Dr. Olson's office. R. 144.  The hearing was on July 27, 2005.  R. 210.  The ALJ reported that the record would be held open until August 25, 2005.  R. 255.  After the hearing, Shelton's counsel obtained records from Baton Rouge General and Dr. Clifford Williams and forwarded them to the ALJ on July 29, 2005.  R. 177-78 and 194.  At the hearing there was testimony that Shelton was sent to East Jefferson General Hospital.  R. 253-55.  The ALJ reported that the record would be held open until August 25, 2005 for the records from East Jefferson as well as any other pertinent medical records.  R. 255.  There are no records from East Jefferson.  No explanation is offered for why Shelton's counsel did not obtain additional records from Dr. Olsen.  Drs. Olson and Baker were both with the NeuroMedical Center in Baton Rouge.  A further request would have obtained the records from both neurologists.  It is likely that the disruption caused by Hurricane Katrina on August 29, 2005 contributed to the failure to provide the records to the ALJ.

Further, the transcript of the hearing before the ALJ reveals much confusion on the part of the plaintiff.  Dr. Baker's review of her symptoms included memory loss and confusion.  A. 26.  Shelton had a long history of medical treatment since childhood.  It is likely that Shelton's symptoms also contributed to the failure to obtain the records from Drs. Olson and Baker.

There was good cause for Shelton's failure to incorporate the additional medical evidence into the administrative record.  Shelton's motion to submit additional evidence should be granted.  The matter should be remanded so that the ALJ may consider this evidence.  It is not necessary to consider the remaining issues raised by Shelton.

## RECOMMENDATION

Accordingly, IT IS RECOMMENDED that: (1) Shelton's motion to submit new and material evidence (Rec. doc. 12) be granted; (2) Shelton's for summary judgment (Rec. doc. 13) be granted in part and denied in part; (3) the Commissioner's motion for summary judgment (Rec. doc. 17) be granted in part and denied in part; and (4) this matter be remanded to the ALJ for consideration of the additional medical evidence.

## OBJECTIONS

A party's failure to file written objections to the proposed findings, conclusions and recommendations in a magistrate judge's report and recommendation within ten (10) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. Douglass v. United Servs. Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (*en banc*).

New Orleans, Louisiana, this 13th day of February, 2007.

**SALLY SHUSHAN**
**United States Magistrate Judge**